Heidi Li, Esq., SBN 202068
Matthew J. Webb, SBN 148228
The Law Offices of Matthew J. Webb
409 – 13th Street, Tribune Tower, 17th Floor
Oakland, CA 94612
Telephone: (510) 444-4224
Facsimile: (510) 444-4223
email: heidili@mwebblaw.com

Attorney for Plaintiffs
Juan Murillo, Maria Murillo, Martha Jimenez,
Amalia Rios and Maria Muñoz

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

(Oakland)

| | |
|---|---|
| JUAN MURILLO aka JUAN MANUEL MURILLO; MARIA MURILLO aka MARIA JUDITH MURILLO; MARTHA JIMENEZ; AMALIA RIOS aka AMALIA GALVAN RIOS; and MARIA MUÑOZ, | Case No:   C07-02199 MEJ |
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR:** |
| vs. | 1. **FHAA (42 U.S.C. § 3601 et seq.);** |
| | 2. **ECOA (15 U.S.C. § 1691, et seq.);** |
| FRANCISCO CERVANTES;  TERESA DIAZ; BOBBY RAY LEE; FIRST FEDERAL MORTGAGE BANKERS, INC. dba CITYWIDE PROPERTIES dba CITYWIDE HOME LOANS dba RAM CAPITAL CORP.; HAROLD BLANCO; EAGLE LITERACY GROUP, INC.; NEW CENTURY MORTGAGE CORP.; WELLS FARGO BANK, NA.;  CHASE HOME FINANCE, LLC, OCWEN LOAN SERVICING, LLC and DOES 1-100, | 3. **RESPA (§§ 2605(a), 2607, Reg. X § 3500);** |
| | 4. **FEHA (Cal. Gov't Code § 12955, et seq.);** |
| | 5. **Unruh Act (Cal. Gov't Code § 51 et seq.);** |
| | 6. **Foreign Language Contract Act (Cal. Civ. Code § 1632);** |
| | 7. **Breach of Fiduciary Duties;** |
| | 8. **Fraud and Misrepresentation;** |
| | 9. **Negligence;** |
| | 10. **Violation of False Advertising Act (Bus. Code § 17500, et seq.)** |
| | 11. **Violation of Unfair Business Practices Act (Cal. Bus. Code § 17200, et seq.));** |
| | 12. **Injunctive Relief** |
| Defendants. | **[JURY TRIAL DEMANDED]** |

Plaintiffs complain as follows:

# I. **INTRODUCTION**

1.      This is an action for declaratory judgment, permanent injunctive relief and damages for predatory and discriminatory lending on the basis of race and national origin in the provision of financial

1    mortgage lending assistance.  This action arises under the Fair Housing Act of 1968 ("FHA"), as

2    amended, 42 U.S.C. § 3601, et seq.;, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et

3    seq.; the Real Estate and Settlement Procedures Act ("RESPA"), 12 U.S.C.  § 2601, et seq.; the California

4    Fair Employment and Housing Act, Cal. Gov't Code § 12955, et seq.; the California Unruh Civil Rights

5    Act, Cal. Gov't Code § 51 et seq.; and the California Foreign Language Contract Act, Cal. Civ. Code §

6    1632, Cal. Bus. and Professions Code § 1720, et seq., and is based on other herein enumerated California

7    statutory and common law claims including breach of fiduciary duty, fraud and negligence.

8           2.     This action is being brought by individuals Juan Murillo aka Juan Manuel Murillo, Maria

9    Murillo aka Maria Judith Murillo, Martha Jimenez, Amalia Rios aka Amalia Galvan Rios and Maria

10   Muñoz (each sometimes referred to separately as "Plaintiff," and together as "Plaintiffs"), owners-in-fact

11   of two real properties located in Contra Costa County, owing, in particular, to defendants Francisco

12   Cervantes, Teresa Diaz, Bobby Ray Lee, and First Federal Mortgage Bankers, Inc. dba Citywide

13   Properties dba Citywide Home Loans dba Ram Capital Corp.'s  (hereafter "FFMB"),  predatory and/or

14   discriminatory loan practices.  These aforesaid defendants, in their various capacities, are hereafter

15   referred to in this complaint as either, "Defendant mortgage brokers," "Defendant realtors" and/or

16   "Defendant mortgage brokers and realtors" or "Defendants FFMB, Cervantes, et al."

17          3.     On information and belief, each of the plaintiffs alleges that s/he has fallen victim to an on-

18   going real estate "bait-and-switch" scheme orchestrated by these defendant mortgage brokers and realtors.

19   Under this scheme, defendants FFMB, Cervantes et al. use fraud and trickery to induce potential

20   homeowners into purchasing properties that they cannot afford.

21          4.     Specifically, defendants FFMB, Cervantes, et al. market their real estate and mortgage

22   brokering services within the San Francisco Bay Area to consumers who are of Hispanic national origin

23   through various local advertising, marketing and outreach, and other individualized solicitation which

24   focus primarily, if not exclusively, on reaching a market of consumers who are of Hispanic origin and are

25   also mainly Spanish language speakers.

26          5.      As a direct and proximate result of these unfair, deceptive and predatory lending and

27   discriminatory marketing and solicitation practices, these same defendants have collected thousands of

28   dollars in realtor commissions and brokerage fees from these home purchase and related mortgage loan

transactions, while the low-moderate income consumers and homeowners of Hispanic national origin, such as the plaintiffs, whom they have put into unaffordable purchase loans, are left with properties and home loans that they are unable to afford.

6.     Defendants Francisco Cervantes and Teresa Diaz prey upon the limited financial resources of vulnerable, primarily monolingual Spanish-speaking individuals of Hispanic national origin by "baiting" them with direct misrepresentations and individualized false promises that these individuals, as low-moderate-income consumers, will be able to afford to purchase their own home, one which will cost tens if not hundreds of thousands of dollars more than what these homebuyers can actually afford.

7.     However, soon after defendants induced these vulnerable Hispanic consumers to purchase their homes, these consumers discover then that they are unable to afford the monthly mortgage payment amounts of their loans.  Defendants: a)  aggressively, deceptively and in an exploitative fashion marketed expensive and costly home mortgage loans to them as primarily or exclusively monolingual Spanish-speaking consumers of Hispanic national origin; b) put many of these consumers, including the plaintiffs in this action, into these expensive mortgages without regard for their ability to pay off these loans;  and c) "baited" these consumers with false promises that they would receive low-cost, affordable mortgages only to "switch" the terms of these new mortgages at the time of closing to costly, subprime loans or loans with otherwise unaffordable loan terms (e.g., higher  closing costs and fees, higher APRs and monthly payments, interest only teaser rate loans and balloon notes and with onerous  pre-payment provisions). Additionally, defendants Cervantes, et al. have further exploited a primarily Spanish-speaking Hispanic consumer market and population in the San Francisco Bay Area region by advertising and conducting a regular real estate show on a local Spanish language radio station, by using Spanish language advertising, including on the internet and on business cards, to promote their services to the public, and by doing focused and individualized outreach to local San Francisco Bay Area-based Spanish-speaking community or religious groups comprised largely of Hispanic members.

8.     As such, defendants Francisco Cervantes and Teresa Diaz, in their authorized capacities as employees, representatives, and/or agents on behalf of Defendants Bobby Ray Lee and FFMB dba Citywide Properties dba Citywide Home Loans dba Ram Capital Corp., and as mortgage brokers, realtors or otherwise authorized agents and/or employees of said broker and his affiliated business entities, have

engaged in discriminatory mortgage brokering and related lending practices by almost exclusively targeting primarily Spanish-speaking Hispanic individuals for predatory and unfair "bait and switch" schemes.

9.    Among other targeted marketing tactics, defendants FFMB, Cervantes, et al. used defendant Diaz's connections with at least one San Francisco-based church group whose membership is comprised largely of mono-lingual Spanish-speakers of Hispanic origin in order to find victims for their schemes.  In particular, defendants targeted individuals with little or no financial sophistication and an inability to read documents in English.

10.    Though defendants FFMB, Cervantes, et al. conducted all verbal communications pertaining to the transactions with plaintiffs in Spanish, they provided no legally required Spanish language documentation or other translation for key purchase and loan documents and thus provided plaintiffs with no opportunity to protect themselves against these defendants' predatory and discriminatory bait-and-switch tactics.

11.    Defendants FFMB, Cervantes, et al. by conducting their mortgage brokering and related real estate business and services in the manner described herein have engaged in predatory, exploitative and unfair business lending practices in violation of the law.

12.    Based on information and belief, plaintiffs further allege that said Defendants have violated their rights as persons of Hispanic national origin who sought both housing and credit under federal and state fair housing and fair credit laws.

13.    As a result, plaintiffs, and each of them, seek equitable relief and damages including but necessarily limited to: rescission and/or reformation of their loans, compensatory, punitive and/or statutory damages, and attorneys fees and costs against each of the defendants named herein as may be proper.

## II.   JURISDICTION AND VENUE

14.    Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 in that the claims alleged herein arise under the laws of the United States.  Jurisdiction is further conferred upon this Court pursuant to 15 U.S.C. §1691e; 28 U.S.C.§§ 1343 and 1367; and 42 U.S.C § 3613.

15.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and

determine plaintiffs' state law claims because those claims are related to plaintiffs' federal claims and arise out of a common nucleus of related operative facts.  Plaintiffs' state law claims are so related to plaintiffs' federal law claims that those claims form part of the same case or controversy under Article III of the United States Constitution.

16.   The Court has jurisdiction over plaintiffs' action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2203 and Rule 65 of the Federal Rules of Civil Procedure.

17.   Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) in that the unlawful conduct that gives rise to these claims occurred within the Northern District of California.

### III.  INTRADISTRICT ASSIGNMENT

18.   Intradistrict assignment in either Oakland or San Francisco is proper because the unlawful conduct that gives rise to these claims occurred in Contra Costa County.

### IV. PARTIES

19.   Plaintiffs Juan Murillo aka Juan Manuel Murillo (hereafter "Juan Murillo") and Maria Murillo (hereafter both together referred to as "The Murillos") are a married couple of Hispanic origin originally from Mexico.  At all times relevant herein, they have been residents of Contra Costa County.

20.   Prior to being induced by one or more of the defendants named herein to purchase a home they could not afford, real property commonly known as 5130 Homestead Way, Antioch, CA 94531, (hereinafter referred to as "5130 Homestead Way" or "Homestead property"), the Murillos along with their oldest child lived in a two-bedroom, one bath apartment in Antioch, California.

21.   Plaintiff Martha Jimenez is the sister of plaintiff, Maria Murillo. Prior to seeking to purchase the Homestead property jointly with the Murillos, Ms. Jimenez lived temporarily with another family member in Antioch, California.

22.   At all times relevant, the Homestead property was and is legally described as:

    a.  "Lot 462, as shown on the Map Subdivision 7619, filed July 8, 1993, Map Book 367, Page 1, County of Contra Costa Records, and as amended by Certificate of Correction recorded August 20, 1993, Book 18861, Page 598.  Official Records…(Being APN: 056-190-125)"

23.   Plaintiffs Amalia Rios aka Amalia Galvan Rios (hereafter "Amalia Rios" or "Rios") and

**Murillo, et al. v. Cervantes, et al.** – (Case no. C07-02199 MEJ)  Second Amended Complaint

- 5 -

Maria Muñoz are two unrelated adult females of Hispanic origin.  At all times relevant herein, they were residents of either San Francisco, San Mateo or Contra Costa Counties.

24.    Prior to being induced by one or more of the defendants named herein to purchase a home they could not afford, real property commonly known as 3529 Camby Road, Antioch, CA  94509 ("3529 Camby Road" or the "Camby property", plaintiff Rios had been living in different rental housing in either San Francisco, Contra Costa or San Mateo Counties. At that time, plaintiff Muñoz was living in Brentwood, California and providing weekday live-in child care services to a long-time employer.

25.    At all times relevant, the Camby property was located in Contra Costa County and was and is legally described as:

> a.    "Lot 82, Tract 2661, designated in the Office of the Recorder of the County of Contra Costa, State of California, on June 17, 1959, Book 73, of Maps, at Page 31.  APN: 071-174-010."

26.    All of the Plaintiffs, except Martha Jimenez, speak and read primarily Spanish and possess limited or no comprehension of either oral or written English. Plaintiffs Juan Murillo and Maria Muñoz have no ability to write or read English.  Plaintiffs Maria Murillo and Amalia Rios have very limited ability to write or read English.

27.    Accordingly, all verbal communications between the plaintiffs and the defendant brokers and realtors named herein, as alleged in this complaint, occurred in the Spanish language, unless specifically alleged otherwise.

28.    On information and belief, and at all relevant times, defendant Francisco Cervantes ("Cervantes") was and is a real estate salesperson licensed by the California Department of Real Estate (salesperson license no. 01372112) and doing business within Contra Costa County, California.  On information and belief, and at all times relevant, Cervantes was an employee of defendant First Federal Mortgage Bankers dba Citywide Properties dba Citywide Properties dba RAM Capital Corp. ("First Federal" or "FFMB") and his actions alleged herein were within the course and scope of his employment or agency.

29.    On information and belief, and at all relevant times, defendant Teresa Diaz (hereinafter "Diaz") was an authorized employee, agent and/or representative of defendants Cervantes, First Federal Mortgage Bankers dba Citywide Home Loans dba RAM Capital Corp. and her actions alleged herein

1    were within the course and scope of her employment or agency.  On information and belief, and at all

2    relevant times, defendant Diaz was not licensed by the California Department of Real Estate for any

3    purpose or in any capacity.

4          30.     On information and belief, and at all relevant times, defendant Bobby Ray Lee ("Lee") was

5    and is an individual licensed as a real estate broker (license no. 01083097) by the California Department

6    of Real Estate.

7          31.     On information and belief, and at all relevant times, defendant First Federal Mortgage

8    Bankers, Inc. dba Citywide Properties dba Citywide Home Loan dba RAM Capital Corp. ("First Federal"

9    or "FFMB") was and is a corporation licensed in the State of California and doing business in Contra

10    Costa County California with a principal place of business at 1101 South Winchester Blvd., H188, San

11    Jose, CA 95128 and also in the Mission District of the city of San Francisco.

12          32.     On information and belief, and at all relevant times, defendant Lee was and is defendant

13    FFMB's only designated officer and real estate broker licensed by the California Department of Real

14    Estate.  Plaintiffs are informed and believe that defendant FFMB's business activities within Contra Costa

15    County included the brokerage of real estate, brokerage of loans secured by real property, and

16    representation of parties in residential real estate transactions.

17          33.     On information and belief, as the designated officer of defendant FFMB, defendant Lee was

18    and is responsible for the training, supervision, and control of defendant FFMB's activities which required

19    a California Department of Real Estate broker license and which were conducted on behalf of the

20    corporation by its officers, employees, and/or agents.

21          34.     On information and belief, and at all relevant times, defendant Harold Blanco ("Blanco")

22    was an authorized agent and/or employee of defendant Eagle Literacy Group, Inc. ("ELG"), a business

23    located in Placer County which does business in Contra Costa and San Francisco Counties and is affiliated

24    in some capacity with defendants FFMB and/or Cervantes.  As such, defendant Blanco's actions as

25    alleged herein were within the course and scope of his employment or agency.

26          35.     On information and belief, and at all relevant times, defendant ELG was and is a

27    corporation licensed in the State of California which is doing business in San Francisco and Contra Costa

28    Counties, California with a principal place of business at 224 Vernon Street, Roseville, California 95678.

**Murillo, et al. v. Cervantes, et al.** – (Case no. C07-02199 MEJ)  Second Amended Complaint

36.    On information and belief, and at all times relevant, defendant New Century Mortgage Corp. ("New Century") was and is a corporation organized and existing under the laws of the State of California.  Defendant New Century's business activities within Contra Costa County included the origination, acquisition or servicing of loans secured by residential real estate, including one or more loans which currently are or were previously secured by a deed of trust against one or more real properties that are the subject of this action.

37.    On information and belief, and at all times relevant, defendant Wells Fargo Bank, N.A. ("Wells Fargo") was and is a corporation organized and existing under the laws of the State of California. Defendant Well Fargo's business activities within Contra Costa County included the origination, acquisition or servicing of loans secured by residential real estate, including one or more loans which are currently secured by a deed of trust against one or more real properties that are the subject of this action.

38.    On information and belief, and at all times relevant, defendant Chase Home Finance, LLC ("Chase") was and is a corporation organized and existing under the laws of the States of Ohio and New York.  Defendant Chase's business activities within Contra Costa County included the acquisition and/or servicing of loans secured by residential real estate, including one or more loans which are secured by a deed of trust against one or more real properties that are the subject of this action.

39.    On information and belief, and at all times relevant, defendant OCWEN Loan Servicing, LLC ("OCWEN") was and is a corporation organized and existing under the laws of the State of Florida. Defendant OCWEN's business activities within Contra Costa County included the acquisition and/or servicing of loans secured by residential real estate, including one or more loans which are secured by a deed of trust against one or more real properties that are the subject of this action.

40.    On information and belief, each of the named defendants in some manner contributed to the wrongs and damages alleged herein, or claims, or may claim, some interest in the subject real properties identified herein as the "Homestead Way" and the "Camby Road" properties.  The names, capacities and relationships and any additional allegations as might later be discovered of the named defendants and those defendants referred to as Does 1 through 20 will be alleged by amendment to this complaint when those names are known and such later information is discovered.

41.    Does 1 through 20, inclusive, are sued under fictitious names.  Their true names and

capacities are unknown to plaintiffs.  When their true names and capacities are ascertained, plaintiffs will amend this complaint by inserting their true names and capacities herein.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that these defendants caused their damages as herein alleged.

42.    Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned each and every defendant was the agent, servant, employee and/or representative of each and every other defendant and was, in doing the things complained of herein, acting within the scope of said agency, service, employment and/or representation, and that each and every defendant herein is jointly and severally responsible and liable to plaintiffs for the damages hereinafter alleged.

## V. **FACTS**

### **JUAN MURILLO, MARIA MURILLO AND MARTHA JIMENZ**

43.    Plaintiffs Juan and Maria Murillo ("Plaintiffs Murillo" or "The Murillos") are a primarily Spanish-speaking couple of Hispanic origin.   Both speak, read and write little or no English.

44.    Juan Murillo is thirty-four years old roofer.  He is a roofer by trade, and has worked for almost ten years with the same employer. Maria Murillo is thirty-one years old.  She works full-time as a clerk at retail store.

45.    The Murillos have been married since 1997.  They are the parents of two young boys, Efrian, who is eight years old, and Angel who was born in September of 2005.

46.    Plaintiff Martha Jimenez is the sister of plaintiff Maria Murillo.  Ms. Jimenez is thirty-three years old.

47.    At all times relevant herein, Ms. Jimenez has worked more than half time or on a full-time basis, while also pursuing part-time college or graduate level studies.

48.    Plaintiff Jimenez's reading and writing comprehension level in both English and Spanish is at a college level, though Spanish is Ms. Jimenez's preferred language.

49.    In or on about late April of 2005, the Murillos, together with Martha Jimenez, began looking for an affordable home to purchase in the city of Antioch in Contra Costa County, California.

50.    In or about late April of 2005, plaintiff Juan Murillo's monthly income was $3,200 gross

1    per month. Plaintiff Maria Murillos' full-time gross monthly income then was $1,600 per month. Plaintiff

2    Martha Jimenez' gross income, at that time, was $1,600 per month.

3         51.   In or about late April of 2005, when the Murillos and Ms. Jimenez sought to purchase their

4    first home, their total combined income was approximately $6,400 gross per month or approximately

5    $4,800 net per month.

6         52.   Since 1993 until the present date, plaintiff Martha Jimenez has been a devout and active

7    member of the Verbum Dei Missionary Fraternity community church group (hereafter "VDMF").  This

8    worship group is an affiliated and recognized religious community of the Catholic Church.

9         53.   Since 1999 until the present date, plaintiff Jimenez has regularly attended meetings of a San

10   Francisco, California-based local VDMF group.

11        54.   Based on information and belief, over the past five years, defendant Teresa Diaz had also

12   been an active and regularly attending member of this same VDMF group in San Francisco, California.

13        55.   In or before 2003 and continuing up until April of 2005, Martha Jimenez knew defendant

14   Teresa Diaz as a fellow VDMF group member and church goer.

15        56.   During defendant Diaz's acquaintance with plaintiff Jimenez through the VDMF group, Ms.

16   Diaz, in the Spring of 2005, mentioned on one or more occasion, to Ms. Jimenez that she was learning the

17   real estate business from a realtor named Francisco Cervantes and was also starting to work for him.

18        57.   In response, in or about late April of 2005, plaintiff Jimenez mentioned to defendant Diaz

19   that her sister and brother-in-law, the Murillos, were looking along with her for an "honest broker" who

20   could help them all get a home loan.

21        58.    On one or more occasions while both were attending a VDMF church group meeting,

22   starting in or about late April of 2005, defendant Diaz told plaintiff Jimenez that defendant Cervantes

23   could help her and her family.  Defendant Diaz then told Ms. Jimenez that Mr. Cervantes was an "honest"

24   and "good man" and would explain everything to them as prospective borrowers.

25        59.   In or about late April of 2005, based on defendant Diaz's verbal representation to her that

26   Mr. Cervantes was a "very honest man," "would explain everything to them," and could help them to buy

27   a home, Ms. Jimenez agreed to Ms. Diaz's suggestion to schedule an appointment for the Murillos and her

28   to meet with defendant Francisco Cervantes.

Murillo, et al. v. Cervantes, et al. – (Case no. C07-02199 MEJ)  Second Amended Complaint

- 10 -

60.    In or on April 21, 2005, the Murillos and Martha Jimenez all met with defendants Cervantes and Diaz at an unmarked office on Mission Street located close by to 22 – 23rd Streets, in San Francisco. This office appeared to be an old bank office.

61.    The April 21, 2005, meeting started in the early evening at or about 7:00 p.m. and lasted approximately two hours. Defendant Cervantes conducted the meeting with the plaintiffs, and defendant Diaz was, at times, also, present at this meeting.

62.    During the April 21, 2005, meeting, defendant Cervantes immediately told the Murillos that they had excellent credit.

63.    For the April 21, 2005, meeting, plaintiff Jimenez, in response to defendant Diaz's request, for plaintiffs Juan and Maria Murillos and herself, provided copies of the following documents to defendant Cervantes for all of them: 1) their previously run credit reports; 2) bank statements for savings and checking accounts for the past two months 3) two paycheck stubs or W-2s; and 4) two years of tax returns.

64.    Plaintiff Martha Jimenez began this April 21, 2005 meeting by asking several questions of defendant Francisco Cervantes about plaintinff's eligibility for a prime rate loan and what were the fees that Mr. Cervantes would charge.

65.    In response, plaintiffs Murillos and Jimenez recall, based on information and belief, that defendant Cervantes said, "I do not go by points."

66.    Additionally, on information and belief, defendant Cervantes told the plaintiffs he would receive no more than $3,000 in fees for helping them to obtain a loan.

67.    During their April 21, 2005, meeting, defendant Cervantes then restated on more than one occasion to the Murillos that they had "good credit" and "can buy all of Antioch if [they] want."

68.    During this same meeting, defendant Cervantes stated to the Murillos and Ms. Jimenez that including Ms. Jimenez on the loans "could affect the Murillos" negatively and that the Murillos might get a worse loan if Ms. Jimenez was included.

69.    At this point during the April 21, 2005, meeting, defendant Cervantes told the Murillos that he would be able to offer them two separate loans to cover the purchase price of a new home. Specifically, Mr. Cervantes told the Murillos that the first loan he could get them would have an interest

rate of approximately 5.6% and the a second rate of about 6.8%.

70.    Defendant Cervantes did not tell any of the three plaintiffs verbally at this meeting, nor at any time thereafter, that any loan or loans he or defendant FFMB would obtain for the Murillos would have an adjustable rate, nor that this result in an interest rate far higher than the initial loan rate.  Nor did defendants Cervantes or Diaz that day or at any future date tell the plaintiffs that the loan or loans they would receive will also include a costly pre-payment penalty provision.

71.    During the April 21, 2005 meeting, defendant Cervantes never mentioned to the Murillos nor to Ms. Jimenez that their monthly loan payment amount(s) or loan interest rate(s) would  also be affected by how large the loan was that they eventually obtained.

72.    At no point during this initial April 21, 2005 meeting, nor during any subsequent communications with these plaintiffs, did defendants Cervantes or Diaz ever explain to the Murillos or Ms. Jimenez exactly how they could afford to pay for a house or what size loan they could afford to pay.

73.    Plaintiffs Murillos and Jimenez trusted defendant Teresa Diaz's initial and subsequent representations to them that "Mr. Cervantes was an "honest" and "trustworthy man." Additionally, these plaintiffs believed that Ms. Diaz -- as a fellow member of Ms. Jimenez's VDMF church group -- was herself honest and trustworthy.   Because of this belief, plaintiffs relied on the loan and other information presented by these defendants to them in or about April 21, 2005.

74.    At the close of this April 21, 2005 meeting, defendant Cervantes told plaintiffs that they would have to act "quickly" in order to get a "good" interest rate.

75.    Defendant Cervantes closed this April 21, 2005 meeting stated to the Murillos and Ms. Jimenez that he could get the Murillos a "good loan" and that Teresa Diaz would help them to find a home.

76.    Toward the end of this April 21, 2005 meeting, defendant Cervantes also said in passing to these plaintiffs that he had two related businesses, "Citywide" and "First Federal." Defendant Cervantes then briefly and only generally mentioned to plaintiffs that his fees for providing them realtor and loan brokering services would be in some way related.

77.    At the end of this meeting, defendant Cervantes presented to plaintiffs Murillo and Jimenez several documents to sign, but he not did explain clearly to them what these documents were that they

were signing. The document signing was done quickly.

78. Throughout much of this meeting, plaintiffs Murillo and Jimenez saw defendant Diaz at Cervantes' direction copying papers for Mr. Cervantes and bringing over various papers for the Murillos or Ms. Jimenez to sign. Plaintiffs Murillo and Jimenez saw defendant Diaz come in and out of the room frequently while they were meeting with Mr. Cervantes. Defendant Diaz would periodically sit down to listen to what defendant Francisco Cervantes was saying to the plaintiffs.

79. All verbal communications during this April 21, 2005 meeting between plaintiffs Murillo and Jimenez and defendants Cervantes and Diaz were entirely in Spanish.

80. After this April 21, 2005 meeting with defendant Francisco Cervantes, the plaintiffs had no other in person meetings or direct communications with Mr. Cervantes.

81. All subsequent meetings and conversations between plaintiffs Juan and Maria Murillo and Martha Jimenez were solely with defendant Teresa Diaz acting on behalf of defendants Cervantes and FFMB.

82. Shortly thereafter, plaintiffs Murillo and Jimenez understood from talking with defendant Diaz that Ms. Jimenez would not be included on any loans for the purchase of a home.

83. In or around early May 2005, defendant Diaz, in response to plaintiffs' request and on behalf of defendant Cervantes, presented plaintiffs with a Good Faith Estimate ("GFE") form with some figures and numbers written on it. This handwritten preliminary GFE lists: a) a "proposed Loan Amount" of $475,000; b) interest rate of 6.8% with monthly payments of $2,469; c) total closing costs and fees of no more than $2,469.79; and d) total of only $2,000 in "Mtg Broker Commission/Fee."

84. Most of the open house showings and sales listings the Murillos received from defendant Diaz, at this time, were for homes listed for sale at $500,000 and up.

85. In or about late April of 2005, plaintiff Jimenez joined the Murillos on the second of these three outings to look at home listed for sale.

86. On this day, defendant Diaz brought home sales listings with her for plaintiffs to look at which listed homes for sale at $500,000 and up. She showed these listing to the plaintiffs as they went to different open house locations.

87. After viewing a second house, plaintiff Martha Jimenez specifically informed Ms. Diaz that

1    she thought they should try to see homes that were, at most, in the $400,000 to $450,000 price range.

2        88.    Ms. Jimenez then expressed concern as to why Ms. Diaz was only showing them homes

3    listed for sale that day that all had $500,000 - $600,000 sale listing prices.

4        89.    During this meeting, plaintiffs clearly informed to defendant Diaz that they all felt, based on

5    their combined incomes, that together they could afford to pay $2,800 per month, and, no more than

6    $3,000 per month total, for a mortgage loan for a house and that this monthly payment would need to

7    include payment for "everything" – e.g., homeowners insurance and property taxes.

8        90.    Plaintiff Jimenez then departed and plaintiff Juan Murillo then informed defendant Diaz

9    then that the best option for them as a family, he thought, was to buy a home that would cost them all no

10   more than $2,000 - $2,400 total per month in payments, since together they could all manageably afford

11   monthly mortgage payments, including to cover payment for homeowners insurance and property taxes,

12   of no more than about $2,800 to $3,000 per month at most.

13       91.    Based on this, the Murillos informed defendant Diaz they were concerned that they might

14   not be able to afford the homes that Diaz was taking them to see.

15       92.    In response, Ms. Diaz represented to the Murillos that whether a house cost $450,000 or

16   $550,000 or up to $650,000, the monthly cost for the loans to buy any of these houses wouldn't really be

17   very different.

18       93.    Additionally, defendant Teresa Diaz further assured the Murillos that defendant Cervantes

19   would be able to help them buy whatever house that they wanted and to not worry.   Defendant Diaz said

20   to them, "Trust me."

21       94.    Defendant Diaz, subsequently, provided the Murillos with other listings of homes for sale in

22   Antioch.   From these listings, the Murillos saw the 5130 Homestead Way property listed for sale at

23   $450,000.

24       95.    In or about late April or early May of 2005, plaintiffs Juan and Maria Murillo went out to

25   look at homes with defendant Teresa Diaz for a third time and, on that day, saw the inside of the 5130

26   Homestead Way property.

27       96.    Plaintiff Juan Murillo noted that the Homestead Way property needed some fixing and

28   repairs but both Murillos liked the location of this home in Antioch.

97.    Plaintiffs Murillo spoke with defendant Diaz while standing outside in front of the home. Plaintiff Murillo said to defendant Diaz he thought the following repairs needed to be done to the house: painting of the inside of the entire house, fixing the leak in the ceiling, repair or replacement of faucets and leaks in the bathroom and kitchen, fixing of broken window screens and yard gate, and repair or replacement of some of the gutters.  Mr. Murillo further stated that he thought he could fix or replace these things himself.

98.    In response, defendant Teresa Diaz represented to the Murillos that, if they made an offer, they could pay a lower price or could get a $5,000 credit back from the seller.  Ms. Diaz further stated to the Murillos, "Don't worry, someone will come in to inspect the house."

99.    That day, the Murillos verbally authorized defendant Diaz to speak to defendant Francisco Cervantes about presenting a $450,000 purchase offer for them to the sellers of the Homestead Way property, inclusive of an initial $5,000 good faith down payment.

100.    Within one and one-half week after seeing the Homestead Way home, Ms. Diaz called Maria Murillo and informed her that the sellers had accepted the Murillos' purchase offer.

101.    Approximately two weeks later, defendant Diaz called and requested that plaintiffs meet her to sign offer papers.  The Murillos met Ms. Diaz in a parking lot by a small shopping center at Tregallas and Lone Tree Way in Antioch to sign papers.  This meeting lasted about twenty minutes.

102.    Defendant Diaz, throughout this document signing meeting, called defendant Cervantes several times to get his instructions as to what papers specifically the Murillos needed to sign. She then repeated Mr. Cervantes' instructions to her as to where the Murillos should sign on these documents.

103.    The Murillos were rushed to sign papers which were all in English.  Neither defendants Diaz nor Cervantes by phone, at any point, during this meeting explained to them any of the papers they were being asked to sign.

104.    Shortly thereafter in mid-May of 2005, defendant Teresa Diaz called Mr. Murillo to tell him that the Homestead Way property had been appraised for $445,000 which was $5,000 less than the Murillos' offer price. Defendant Diaz told Mr. Murillo that they would have to provide an additional $5,000 in cash so that the sale could go through, as the owner still wanted to sell at $450,000.

105.    In response, plaintiff Juan Murillo informed defendant Diaz then that the Murillos did not

1  have an additional $5,000 in cash.

2      106.   Ms. Diaz called Mr. Murillo back and told him that Mr. Cervantes said the papers were

3  already done, and she continued to press Mr. Murillo to come up with an additional $5,000.

4      107.    Within a few days of these conversations, defendant Diaz called the Murillos again and told

5  them that Mr. Cervantes had reached an agreement with the sellers about the additional $5,000.

6      108.   In or about May of 2005, defendant Diaz contacted plaintiffs Murillos to come sign more

7  papers in English.  This meeting lasted approximately one-half hour and Ms. Diaz spoke several times by

8  phone with defendant Cervantes and rushed the Murillos through the signing without explaining the

9  papers to them.

10      109.   From late April of 2005 onward, defendant Teresa Diaz communicated directly with the

11  Murillos on all matters relating to the purchase of the Homestead Way property.

12      110.   In some limited instances, defendant Diaz would contact Ms. Jimenez or return her calls,

13  but only to request Ms. Jimenez's assistance to help fax or deliver various documents to the Murillos.

14  However, in all such instances, Ms. Diaz would not discuss any specific details with Ms. Jimenez as what

15  these documents represented.

16      111.   From late April through until early June of 2005, defendant Diaz, at various times, gave the

17  Murillos repeated assurances that everything was fine and that they should trust her and Mr. Cervantes.

18  The Murillos, because they trusted both defendants Cervantes and Diaz, believed Ms. Diaz's

19  representations to be true.

20      112.   As a direct result of defendant Diaz's representations to them, plaintiffs Murillo did not

21  bother Ms. Jimenez to speak with her about what Ms. Diaz was saying to them regarding the Homestead

22  Way home purchase and related financing efforts.

23      113.   In or around late May of 2005, defendant Teresa Diaz called the Murillos and informed

24  them that they would need to meet her at one of the offices of Old Republic Title Co. in a few days to sign

25  the remaining papers for the Murillos purchase of the Homestead Way property.

26      114.   Defendant Diaz then called the Murillos a second time later that same day to tell them that

27  they could go instead to an Old Republic Title Co. office in Antioch.

28      115.   The night before the scheduled meeting at the title co. office, defendant Diaz called the

1   Murillos to tell them that she would not be coming to this meeting. Ms. Diaz said she was too busy and

2   could not join them.

3       116.   In or on June 2, 2005, the Murillos met with a title company officer, Suzie Huddleston, to

4   sign various papers. Ms. Huddleston did not speak Spanish and was only able to convey limited

5   information to them with extreme difficulty. The Murillos understood from Ms. Huddleston that they

6   would have to pay a Mello Roos Tax on the property. The Murillos were confused by this, because they

7   had specifically told defendant Diaz in one of their prior conversations with her that they did not want to

8   purchase a property in Antioch subject to this additional tax.

9       117.   During this meeting at the title company office in or about June 2, 2005, the Plaintiffs

10  Murillo wanted to ask more questions about the purchase and financing of their home, but Ms.

11  Huddleston's inability to speak Spanish and their very limited English-speaking abilities made

12  communication extremely difficult.

13      118.   Although the Murillos were not clear as what were the papers they were signing, they

14  proceeded to do so, based on defendant Diaz's prior statements to them that the deal was already

15  "complete."

16      119.   Based on Ms. Diaz's prior representations to them in this regard, and without either Mr.

17  Cervantes or Ms. Diaz or other representatives of defendant FFMB present to explain anything to them,

18  the Murillos believed that they had no other choice that day but to simply sign all of the documents put in

19  front of them.

20      120.   All key purchase and loan documents presented to the Murillos that day to sign relating to

21  their purchase of the Homestead Way property and pertaining to two purchase loans that these plaintiffs

22  received were all written in English.

23      121.   Between late April until June of 2005, all verbal communications between plaintiffs and

24  defendants Cervantes and Diaz on behalf of defendants FFMB, et al. relating to the Murillos' purchase of

25  the Homestead Way property were in Spanish.

26      122.   At all times relevant herein, defendants Cervantes and Diaz neither represented nor stated

27  anything contrary to plaintiffs Murillos and Ms. Jimenez's repeated statements to Ms. Diaz that they could

28  afford to pay together no more $3,000 per month for a monthly mortgage payment, inclusive of

**Murillo, et al. v. Cervantes, et al.** – **(Case no. C07-02199 MEJ) Second Amended Complaint**

- 17 -

1    homeowners insurance and property taxes.

2         123.   In or about one week after signing these papers at the title co. office in Antioch, in early to

3    mid June of 2005, plaintiffs Murillo met with defendant Diaz in front of the Homestead Way property and

4    were given the keys to the house.

5    **MURILLOS AND JIMENEZ'S INJURIES:**

6         124.   Due to defendants complained of conduct and activities, plaintiff Murillos and Martha

7    Jimenez have suffered the following damages:

8         125.   Instead of Plaintiffs Murillo being placed by defendants FFMB, et al. into one or two

9    purchase home loans which would require the plaintiffs to pay no more than $2,800 or $3,000 total per

10   month for their combined mortgage, home insurance and property tax payments, the Murillos later

11   discovered that they had been put into two purchase loans where:

12             a.   The first loan is a $360,000 2/28 30-year adjustable rate mortgage (ARM) first note,

13                  originated by New Century with an initial, two-year fixed rate of 6.8%, starting monthly

14                  payments of $2,040 which will increase initially by $700 more to a $2,7017.34 monthly

15                  payment after the initial two-year fixed, "interest only" payment period on this loan ends

16                  on July 31, 2007.  The initial adjustment up of the interest rate on this loan starting after

17                  July of 2007 will be to no less than 8.3%. The interest rate on this loan then can increase

18                  by as much as 1.5% every six month's starting after August, 2007 and can eventually go as

19                  high as 13.8%. This loan also has a two-year prepayment provision which defendants'

20                  FFMB, Cervantes, et al. never told them about and also never explained to the Plaintiffs

21                  will cost them over six months' worth of interest payment (e.g., in excess of $12,050.00) if

22                  they seek to refinance or otherwise pay-off this first note prior to July 1, 2007 [NOTE: The

23                  NC promissory note states there is no prepayment penalty provision; however, there is an

24                  addendum prepayment provision rider to the note which states the rider supercedes

25                  anything otherwise stated in the note itself. The TILA Disclosure Notice provided to the

26                  borrowers states that the "If you pay off early, you…" "may" Have to pay a penalty";

27             b.   The second  loan is a $90,000 home equity line of credit (HELOC) with a starting 7.625 %

28                  interest rate which adjusts daily dependent on any published changes in the Wall Street

**Murillo, et al. v. Cervantes, et al.** – (Case no. C07-02199 MEJ)  Second Amended Complaint

- 18 -

1       Journal Index Rate.

2          c.   As a result, since July of 2005, plaintiffs have paid on average around $2,800 total per

3               month in payments to cover just their monthly mortgage payments.  They have paid

4               additionally, since July of 2005, over $1,500 for homeowners insurance and $12,432.72 in

5               property tax payments (including two years of Mello Roos tax payments of $657.04 each).

6          d.   Additionally, since August of 2005, while paying an average $2,800 in combined monthly

7               mortgage payments, plaintiffs have been put into predatory loans which are, at best, based

8               on their regular monthly payments since then providing for plaintiffs' "interest only"

9               payments on both home loans. As of February of 2007, the servicing statements for both

10              these loans list the principal balances for the first loan, as currently serviced by Chase at

11              $360,000; and a second Wells Fargo loan at $90,681.79.

12         e.   Additionally, instead of defendants FFMB, Cervantes, et al.'s earning $2,000 - $3,000 total

13              in mortgage broker services fees, the final closing papers sent to the Murillos list that these

14              defendants earned total broker fees of $6,976.60 (e.g., $2,001.60 loan origination fee, $

15              3,600 YSP paid by the lender at time of closing, and $1,375 in additional loan processing

16              fees).

17         126.   On information and belief, plaintiffs Murillos and Jimenez allege that at no time after their

18   initial meeting on April 21, 2005 with Cervantes did he or Ms. Diaz ever verbally inform the plaintiffs

19   that the final required monthly mortgage and other related home payments would exceed more than

20   $2,800 total per month.

21         127.   Additionally, on information and belief, plaintiffs Murillos and Jimenez allege that at no

22   time after their initial meeting on April 21, 2005 with Cervantes did he or Ms. Diaz ever verbally inform

23   the plaintiffs that the final terms of their loans would include two loans with "interest only" adjustable

24   rates and monthly payment amounts totaling initially close to $2,800 per month, and a first loan with a

25   costly two-year prepayment penalty that will adjust up over $700 a month in payments after the first two

26   years.

27         128.   Because they could not read the English language documents provided to them at the title

28   company office, and because no translation was provided to them, plaintiffs Murillo did not learn of the

1   terms of their purchase loans until several days after signing the loans closed.

2       129.   As part of encouraging the Murillos to make a purchase offer, defendant Diaz originally told

3   the Murillos that defendant Cervantes would seek $5,000 in cash back from the seller following the close

4   of escrow so that the Murillos could use this money to make already identified needed repairs to 5130

5   Homestead Way home.  Despite Ms. Diaz's representations, the Murillos never received a $5,000 credit

6   from the seller upon or after close of escrow.

7       130.   Instead, the Murillos have suffered harm of over $5,000 in actual damages for the cost to

8   buy needed home repair and replacement materials.

9       131.   Additionally, plaintiffs Murillo and Jimenez have incurred actual damages of additional

10  payments they have made for homeowners insurance and property taxes of close to $15,000.

11      132.   Plus, actual damages of some quantifiable amount of lost equity value in the Homestead

12  Way property since July of 2005 owing to Plaintiffs' payment of over $53,117 in "interest only" mortgage

13  payments since August of 2005.

14      133.   In addition, plaintiffs Murillo and Jimenez have incurred general damages resulting from

15  the emotional and/or physical distress, pain and suffering they have experienced due to the worry, anxiety

16  and stress they have felt about making home higher payments for over nineteen months and for  originally

17  being deceived and put into predatory and unfair "interest only" adjustable rate home loans, in which the

18  first note has a costly pre-payment penalty and will adjust up initially by $700 per month starting on July

19  1, 2007.

20      134.   Since August of 2005, plaintiff Martha Jimenez has also contributed approximately one-

21  third of the monies necessary to make the home mortgage, homeowners insurance and property tax

22  payments for the Homestead Way property. She too has experienced worry, anxiety and stress about

23  making these payments plus grave concern about these home loans being interest only in nature with the

24  first note adjusting up initially by $700 per month in payments starting on July 1, 2007.  Additionally,

25  plaintiff Jimenez has suffered the humiliation and harm of not having been included on title for the

26  purchase of this property due to the deception and fraud of defendants Cervantes and Diaz on behalf

27  Defendants FFMB, Cervantes, et al.

28      135.   Lastly, since August of 2005, Plaintiffs Murillo and Jimenez have depleted personal savings

and incurred other debt in order to pay for the additional, unanticipated home-related expenses as described herein above.

### AMALIA RIOS AND MARIA MUÑOZ

136.   Plaintiffs Amalia Rios ("Rios") and Maria Muñoz ("Muñoz") are Spanish-speaking individuals of Hispanic origin. Plaintiffs Rios and Muñoz are predominantly monolingual Spanish-speakers. Plaintiff Rios speaks and reads minimal English. Plaintiff Muñoz does not read or write English.

137.   Amalia Rios is a single forty-eight year old mother of one adult son.  She runs her own house cleaning business and has, at all times relevant herein and also worked as an in-home care provider and security guard.

138.   Maria Muñoz is a single, thirty-five year old woman. For the past five or more years, she has been employed by one employer as a weekday live-in childcare provider.

139.   In or about April of 2005, Ms. Rios' monthly income was approximately $2,800 per month and Ms. Muñoz's gross monthly income was $1,000 per month.

140.   Plaintiffs Rios and Muñoz have been friends for over the past five years.

141.   Beginning in 2004, plaintiffs Rios and Muñoz began looking to buy a home together as an investment. Both Rios and Muñoz thought they would be able afford to purchase a home by combining their incomes. Ms. Rios would live in the house full-time and Ms. Muñoz part-time.

142.   Based on their combined incomes, plaintiffs Rios and Muñoz, in April of 2005, calculated that they could afford a home of $300,000 or slightly above that amount.

143.   Plaintiffs Rios and Muñoz are both active and devout members of the same Verbum Dei Missionary Fraternity ("VDMF") church group that both plaintiff Martha Jimenez and defendant Teresa Diaz participate in.   Plaintiff Rios has been a member of this San Francisco-based VDMF group for over 14 years, and plaintiff Muñoz has been a member of it for over 5 years.

144.   Based on information and belief, at all times relevant herein, plaintiffs understood that defendant Teresa Diaz was also an active member of the VDMF group and that she had been a regular member of this fellowship group for approximately five years or more.

145.   For the last five years, plaintiff Rios knew defendant Diaz and often saw her once or twice a

week at these VDMF church group meetings

146.   In early 2005, Plaintiff Rios first heard Ms. Diaz state while both of them were at one of these VDMF church group meetings that Teresa Diaz had attended a real estate conference of some sort and was starting to work for a Mr. Cervantes in order to learn how to sell real estate.

147.   In or about March and April of 2005, plaintiff Rios mentioned to Diaz that Rios and Muñoz were looking to purchase a home.

148.   In response, defendant Diaz informed plaintiff Rios that she—Diaz—had originally approached Defendant Francisco Cervantes to buy a home and, shortly afterwards, Mr. Diaz then hired Ms. Diaz to work for him.

149.   In or around late April of 2005, defendant Diaz represented to plaintiff Rios that she and Cervantes could help Rios and Muñoz find an affordable home.

150.   Additionally, in or around late April of 2005, defendant Diaz told plaintiff Rios that she could schedule an appointment for Rios and Muñoz to meet with Mr. Cervantes, and that he could help them to purchase a home.  She told Rios that Cervantes' motto was "Si se puede" (Yes you can).

151.   At this time and at times relevant herein, defendant Diaz represented, on more than one occasion, to plaintiff Rios that Francisco Cervantes was an "honest" and "trustworthy" man and that he could help her and Ms. Muñoz to buy a home.

152.   Based on the above conversations, in or about late April of 2005, plaintiffs Rios and Muñoz decided to start working with defendants Teresa Diaz and Francisco Cervantes to continue with their home search.

153.   In or about April 21, 2005, plaintiff Rios met with Teresa Diaz and Francisco Cervantes at a San Francisco, California office. All verbal communications between plaintiff Rios and defendants Diaz and Cervantes throughout this meeting took place in Spanish.

154.   Similarly, at all times relevant herein, all subsequent meetings and conversations between plaintiffs Rios and Muñoz and defendants Rios and Cervantes regarding any purchase or loan matters occurred in Spanish.

155.   At this April 21, 2005 meeting, Amalia Rios provided to defendant Cervantes, in response to  an earlier request from Ms. Diaz, copies of her and Maria Muñoz's last three months of bank

statements, their recent credit reports, and their 2004 tax returns.

156.   During this meeting, defendant Cervantes requested that plaintiff Rios confirm both her and Ms. Muñoz's income.

157.   At this April 21, 2005 meeting, defendant Cervantes asked plaintiff Rios how much she could afford each month to pay toward mortgage payments on a new home.  Ms. Rios told Cervantes that she thought she and plaintiff Muñoz together could together afford approximately $2,200 per month, inclusive of property taxes and homeowners insurance.

158.   In response, defendant Cervantes informed plaintiff Rios that for that monthly payment amount, Diaz could show Rios and Muñoz some nice houses. Defendant Cervantes further stated to plaintiff Rios that, after the first six months, the interest rate on their loan(s) would go down.

159.   At this point during the April 21, 2005 meeting, defendant Cervantes then stated to plaintiff Rios that her credit score was not good enough for a loan.  He then sent her that same day to someone who he said could help her improve her credit.  Cervantes directed Ms. Rios to immediately go to the back of the same office and meet with defendant Harold Blanco ("Blanco").

160.   Relying on Cervantes instructions, Rios met with defendant Blanco and paid $529 that day to Mr. Blanco's employer defendant Eagle Literacy Group ("ELG").  While all of Ms. Rios' verbal communications during this meeting with Mr. Blanco were in Spanish, defendant Blanco asked her to sign papers written only in English.

161.   After Ms. Rios finished meeting with defendant Blanco, she went back and met briefly again that same evening with defendant Diaz.

162.   Afterwards, starting in late April up until sometime in May of 2005, plaintiff Rios met with defendant Diaz on two occasions to look at homes listed for sale in Antioch, California.

163.   During this first home viewing trip, plaintiff Rios noticed that the home sale listings that Diaz had brought with her and was showing to her were mostly for homes above a $400,000 sale price.

164.   On or about one late afternoon in early to mid May of 2005, the second instance that plaintiff Rios went to view homes with defendant Diaz, plaintiff Muñoz joined in.

165.   In or about early May of 2005, plaintiff Muñoz went with defendant Diaz to view houses for sale and did so only, because Defendant Diaz offered Ms. Muñoz a ride to Brentwood from the San

1    Francisco after a VDMF church group meeting.

2         166.   While driving Ms. Muñoz home, defendant Diaz then pleaded with Ms. Muñoz to go see a

3    house listed for sale – a home at 3529 Camby Road in Antioch, California.  Plaintiff Muñoz agreed to go

4    and see the Camby Road property with defendant Diaz because Ms. Diaz represented to her then that

5    plaintiff Rios was going to make an offer to buy this house.

6         167.   That day, plaintiff Muñoz viewed with defendant Diaz the Camby Road home for

7    approximately 30 minutes.  Plaintiff Rios arrived later and viewed the house for approximately five

8    minutes.

9         168.   That same day, plaintiff Muñoz initially told defendant Diaz that she was not interested in

10   purchasing 3529 Camby Road.  However, defendant Diaz pressured Ms. Muñoz to go forward with

11   bidding on this home.

12        169.   Defendant Diaz stated to plaintiff Muñoz that because both she and plaintiff Rios were

13   "sisters in faith" that Ms. Muñoz should not abandon Ms. Rios   To pressure them further, defendant Diaz

14   further represented to both plaintiffs Rios and Muñoz that she had been working really hard so that she

15   could get these plaintiffs a house.

16        170.   As a direct result of defendant Diaz's repeated pressure, urging and statements to both

17   plaintiffs, plaintiff Muñoz agreed to go forward to purchase the Camby Road property with her.

18        171.   At defendant Diaz's urging, plaintiffs Rios and Muñoz, in or around early-to-mid May of

19   2005, authorized defendant Cervantes to make an initial offer of $439,000 on their behalf to purchase the

20   Camby Road property.  This was the seller's listed sale price for the house.

21        172.   Relying on defendant Diaz's representations to them, these plaintiffs understood that

22   defendant Cervantes presented this $439,000 offer, and that, afterwards, defendant Diaz then told them

23   that the Camby Road property had a lot of land and that this had not been taken into account.

24        173.   For this reason, defendant Diaz informed plaintiffs Rios and Muñoz that the sellers were

25   now asking for more money for the house.

26        174.   Trusting defendants Diaz and Cervantes, plaintiff Amalia Rios agreed to defendants Diaz

27   and Cervantes' request that they offer more money, because, at that point, Ms. Rios believed that one of

28   her sisters from Mexico was also going to help pay for one-third of the monthly mortgage payments as an

1   investor in the home.

2       175.   At all times relevant, as alleged herein, plaintiff Amalia Rios felt that she was both a friend

3   and a VDMF church "sister" of defendant Teresa Diaz. While plaintiff Maria Muñoz did not feel this way

4   about defendant Diaz, she never thought that Teresa Diaz, as a member of the VDMF fellowship group,

5   would be someone who could harm them.

6       176.   In or about May of 2005, plaintiffs Rios and Muñoz then met with defendant Diaz on two

7   occasions during their regular VDFM group meetings to sign papers relating to their purchase of the

8   Camby Road house.

9       177.   During these two instances, defendant Diaz brought Camby Road property-related papers

10  with her. In each instance, Ms. Diaz simply requested that these plaintiffs sign papers which she

11  represented to them had been prepared by defendant Cervantes.

12      178.   On information and belief, defendant Diaz called defendant Cervantes during these two

13  document signing instances.  Ms. Diaz did not explain any of the papers to them.

14      179.   Shortly afterwards, plaintiff Rios also met with defendant Diaz who came to her apartment

15  in order to have Ms. Rios sign more papers.  Again, defendant Diaz did not explain specifically what the

16  documents were that she was asking Ms. Rios to sign.  During this meeting, Ms. Diaz called defendant

17  Cervantes on more than one occasion to ask him to confirm which papers he wanted signed.

18      180.   In or around June 2, 2005, plaintiffs Rios, and Muñoz, along with defendant Diaz, went to a

19  title company office in Antioch, California. They all arrived separately.

20      181.   Plaintiffs Rios and Muñoz recall this meeting to sign the papers lasted about one hour.

21  There was one other person there a woman when they signed papers from the title company.  The escrow

22  title co. officer explained some things to defendant Diaz in English.  Ms. Diaz, based on information and

23  belief, then briefly spoke afterwards in Spanish to each of the plaintiffs, Ms. Rios and Muñoz.

24      182.   Plaintiffs Rios and Muñoz mostly heard defendant Diaz tell them in Spanish to sign various

25  different documents in certain places. The main thing plaintiff Muñoz recalled Ms. Diaz saying to them

26  was that these were the papers for the loan.

27      183.   During this loan signing meeting, plaintiffs recall defendant Diaz her repeatedly stating that,

28  "Everything is going to be fine, don't worry" and "Trust me."

184.   Throughout this escrow closing meeting, plaintiffs Rios and Muñoz do not recall defendant Teresa Diaz ever telling them specifically anything about the terms or conditions of the loans they were getting.  Plaintiffs do not recall defendant Diaz informing them of the interest rates on their loans, the monthly payment amounts, or any other specific terms.

185.   On information and belief, plaintiffs recall that Ms. Diaz throughout this meeting repeatedly told them "Okay, sign here, sign here."

186.   During this meeting, plaintiffs saw that defendant Diaz would just nod her head in response to what the escrow officer was saying, but then she would just tell them to sign various papers.  Neither plaintiffs understood what was being said by the escrow office that day in English.  Defendant Diaz explained little to them about the documents she asked them to sign.

187.   Based on information and belief, plaintiffs understand that all the papers they were asked to sign that day were in English.

188.   After plaintiffs Amalia Rios and Maria Muñoz had signed all their loan papers inside of the title co. office, they stood then outside with defendant Diaz.

189.   Based on information and belief, plaintiffs Rios and Muñoz recall that Defendant Diaz only represented to them, only after they had completed signing of all final closing loan papers, that they had two loans.

190.   At that point, plaintiff Rios had an unsigned copy of the loan papers in her hand and saw something on one paper that said 11% on it.

191.   In response to plaintiff Rios' question to her, defendant Diaz then confirmed to both plaintiffs that the interest rate on one of their loans would be at 11%.

192.   Plaintiff Maria Muñoz then said to defendant Diaz that this seemed very high.  In response, Ms. Diaz said, "Don't worry, everything will be fine, you can refinance after two years and get a better, lower interest rate then. Also, don't worry I won't abandon you, I will be there for you."

193.   Additionally, only after plaintiffs Rios and Muñoz were outside of the title co. office talking with defendant Diaz did they then find out that they were going to be paying for their homeowners insurance and taxes separately. At that point, plaintiff Rios specifically asked defendant Diaz about this issue.  Diaz responded that these costs were not included in their monthly mortgage payments.

194.   However, defendant Diaz then said to them to not worry because they were going to be receiving an additional check after the close of escrow of a $5,000 seller's credit.

195.   Only at this point, did defendant Diaz then mention to the plaintiffs that their monthly mortgage payments would stay the same for two years and then change and that the payments would not include homeowners insurance and property taxes.

196.   At that point in time, plaintiff Maria Muñoz did not understand what defendant Diaz meant. Only after a friend of hers explained to her what this meant much later, did plaintiff Muñoz understand what an initial fixed rate, interest only, adjustable rate mortgage was and that the interest rate on this would only go up, never down.

197.   However, in or around early May of 2005, the day that both plaintiffs signed their final loan papers at the title company office, plaintiff Rios and Muñoz recalled, based on information and belief, that defendant Diaz specifically stated that Cervantes had said to tell them, "Not to worry … that after 6 months the interest rate on the loans will go down, specifically, the smaller of the two loans."

198.   Based on information and belief, plaintiff Rios took what defendant Diaz said to her to mean that the interest rate on their two loans would go down after two years, not up -- because from what Diaz also said to her, plaintiffs Rios and Muñoz would be able to refinance at that later time into lower interest rate loans.

199.   Outside of the title company office that day, shortly after plaintiffs Rios and Muñoz had just signed their final loan papers, defendant Diaz stated to them and repeated, on more than one occasion, that the interest rates on plaintiffs' two loans would go down after two years.

200.   In June and July of 2005, plaintiff Rios received calls from defendant Cervantes and spoke with Mr. Cervantes by phone on four occasions.  After plaintiffs Rios and Muñoz had signed final loan papers, defendant Diaz informed them that they could move into the Camby Road property before the end of June of 2005.

201.   However, defendant Cervantes called to let plaintiff Rios know that the sellers were in need of more time to move.  In exchange for the Camby Road property sellers getting an additional 1 – 2 months to move out, defendant Cervantes represented to plaintiff Rios that she and plaintiff Muñoz would get some additional money from the sellers.

202.   Additionally, plaintiffs contend based on information and belief, that defendant Diaz had earlier represented to these plaintiffs prior to escrow closing that they would also receive a $5,000 credit back from the sellers after close of escrow.

**RIOS AND MUÑOZ'S INJURIES:**

203.   Only after plaintiffs Rios and Muñoz had signed their final loan papers, did they realize how much higher their monthly payments would be.   Instead of paying a total of $2,000 per month in payments, plaintiffs found their two loan payments to be higher payments of $2,077 and $896.22, respectively.

204.   Additionally, plaintiffs Rios and Muñoz did not discover out until much later, after signing their final loan papers, what exactly were the true costly and unfavorable nature of the loans they had been put into by defendants FFMB, et al.

205.   Due to defendants complained of conduct and activities, plaintiffs Rios and Muñoz have suffered the following damages:

206.   Instead of plaintiffs Rios and Muñoz being placed by defendants FFMB, et al. into one or two purchase home loans which would require these plaintiffs to pay, at any point, no more than $2,200 total per month for their combined mortgage, home insurance and property tax payments, these plaintiffs later discovered that they had been put into two purchase loans where:

    a.   The first loan is a $372,000 2/28 30-year adjustable rate mortgage (ARM) first note, originated by New Century with an initial, two-year fixed rate of 6.7%, with starting monthly payments of $2,077; this monthly payment will increase initially by $752.01 more to a $2,829.01 monthly payment after the initial two-year fixed, "interest only" payment period on the loan ends.   The initial adjustment up of the interest rate on this loan in August of 2007 will be to no less than 8.2%. After August 1,  2007, the interest rate on this loan then can increase by 1.5% every six month's thereafter, and can eventually go as high as 13.7%. This loan also has a two-year prepayment provision which defendants' FFHB, Cervantes, et al. <u>never</u> told plaintiffs about.   Neither Diaz nor Cervantes also never explained to the plaintiffs that it will cost them over six month's worth of interest payment (e.g., in excess of $12,462) if they seek to refinance or, otherwise, pay-off this first loan

note prior to July 1, 2007 [NOTE: The NC promissory note states there is no prepayment penalty provision; however, there is an addendum prepayment provision rider to the note which states the rider supercedes anything otherwise stated in the note itself. The TILA Disclosure Notice provided to the borrowers states that the "If you pay off early, you…" "may" have to pay a penalty";

b. The second loan is a thirty-year $93,000 second note, a subprime purchase loan with a fixed 11.15% interest rate. The monthly payment for this loan is $896.22.

c. As a result, since July of 2005, Plaintiffs have paid $2,973.22 per month for monthly mortgage payments alone. Since July of 2005, they have paid close to an additional $2,000 for homeowners insurance and, to date, have also been liable for over an additional $10,000 in property tax payments.

d. Since August of 2005, while paying $2,973.22 to cover <u>just</u> their monthly mortgage payments – almost $800 per month than what these defendants originally represented, plaintiffs have been put into predatory loans which, to date, have provided for' "interest only" payments on the first loan and, as of February of 2007, less than $700 toward paying off the principal on the second loan. As of February of 2007, the servicing statements for both these loans list the principal balances at for the: 1) first loan, as currently serviced by Chase = $372,000; and 2) second Ocwen serviced loan = $92,411.91.

e. Additionally, defendants FFMB, Cervantes, earned et al. earned a total of $6,961 in mortgage broker services fees, as listed on the final closing papers sent to plaintiffs Rios and Muñoz (e.g., $5,580 loan origination fee, $1,000 in additional loan administration and processing fees and $381 for payment of appraisal and credit report fees).

207. On information and belief, plaintiffs Rios and Muñoz allege that at no time after their initial meeting on April 21, 2005 with Cervantes did he or Ms. Diaz ever verbally inform them that their final required monthly mortgage and other related home payments would exceed $2,200 and would not include payment also for their homeowners insurance and property tax payments.

208. On information and belief, plaintiffs Rios and Muñoz allege that they have been harmed by defendants FFMB, Cervantes, et al. by being "bait and switched" into paying $800 more a month in

<u>Murillo, et al. v. Cervantes, et al.</u> – (Case no. C07-02199 MEJ)  Second Amended Complaint

- 29 -

mortgage payments than they originally stated they could afford (this represents over an eighteen month period an additional $14,600) and an additional $12,000 in unanticipated homeowners insurance and property tax payments since August of 2005.

209.   Additionally, on information and belief, plaintiffs Rios and Muñoz allege that at no time after their initial meeting on April 21, 2005 with defendant Cervantes did he or Ms. Diaz ever verbally inform them that their loans were processed as income-stated loans and that one of these loans which they received would be an "interest only" adjustable rate loan with a costly two-year prepayment penalty and will increase over $750 a month in payments after the first two years.  The second loan they received is a costly 11.15% interest, high cost subprime loan.

210.   Because they could not read the English language documents provided to them at the title company office, and because no translation was provided to them, plaintiffs Rios and Muñoz did not learn of the true and more costly terms of their purchase loans until months after signing the loans closed.

211.   Plus, plaintiffs Rios an Muñoz suffered additional actual damages of some quantifiable amount of lost equity value in the Camby Road property since July of 2005 owing to plaintiffs' payment of over $58,000 in "interest only" mortgage payments since August of 2005.

212.   In addition, plaintiffs Rios and Muñoz have incurred general damages resulting from the emotional and/or physical distress, pain and suffering they have experienced due to the worry, anxiety and stress they have felt about making home higher payments for over twenty months and for  originally being deceived and put into predatory and unfair "interest only" adjustable rate home loans, in which the first note has a costly pre-payment penalty and will adjust up initially by $750 more per month starting on August 1, 2007.

213.   Due to the unanticipated need to pay for an additional $850 plus a month in mortgage payments, plus the added liability since August of 2005 of over $10,000 in homeowners insurance and property taxes, plaintiffs have struggled, since January of 2006 to timely make all their mortgage payments.   This has resulted in an imposition of late fees of several hundreds of dollars and the impairment of their credit ratings since April of 2005.

214.   In or on April 21, 2005, defendant Cervantes ran a credit report for plaintiff Rios. Despite Cervantes' representation to Ms. Rios then that she needed help to repair her credit, the report he ran for

1 which Ms. Rios received a copy of showed that she had a FICO score then of between 712 – 7646.

2     215. In or on April 21, 2005, plaintiff Rios also provided defendant Cervantes with a copy of

3 credit report from January of 2005 for plaintiff Muñoz which showed she had a FICO score then of

4 between 725 - 640.

5     216. Since then, after being placed in costly, predatory and unfair interest only adjustable rate

6 purchase loans, plaintiffs Rios and Muñoz have struggled at times to make their mortgage payments and

7 other related payments for the Camby Road property. As a result, as of March of 2007, both these

8 plaintiffs' FICO scores are lower. Ms. Rios' FICO score is now between 624 - 553 and Ms. Muñoz's now

9 between 628 – 599.

10     217. Furthermore, plaintiffs Rios and Muñoz have suffered harm in not being able to address

11 continuing termite and roof problems at the Camby Road property.

12     218. In or around May and June of 2005, defendants Cervantes and Diaz represented then to

13 these plaintiffs that they would receive after the close escrow a check for $5,000, as a sellers' credit back

14 to them.

15     219. Plaintiffs Rios and Muñoz have suffered actual damages. In or about November of 2005,

16 several months after the close of escrow, they received instead a smaller check for $1,363.94 from the

17 Title Co.

18     220. Additionally, in June and July of 2005, defendant Cervantes verbally represented to plaintiff

19 Rios on more than one occasion that the sellers would pay plaintiffs Rios and Muñoz additional "rent"

20 money for moving out of the Camby Road property late -- almost two months after escrow closed in June

21 of 2005. However, to date, plaintiffs never received any rent payments.

22     221. Instead, plaintiff Rios incurred the cost of paying over $1,000 in rent for staying at another

23 place in June and July of 2005 due to the seller's delayed move-out in late July of 2005.

24     222. On information and belief, plaintiffs contend that defendants FFMB, et al., in or about June

25 and July of 2005, may have received some rent payment from the sellers, but then kept the money.

26     223. Additionally, defendant Diaz represented to plaintiff Rios, on one or more occasions, prior

27 to the plaintiffs' signing of final loan papers, that the sellers of the Camby Road property would fix both

28 termite infestation and roof leakage problems before turning over the property to Ms. Rios and Ms.

Murillo, et al. v. Cervantes, et al. – (Case no. C07-02199 MEJ) Second Amended Complaint

- 31 -

1   Muñoz.  When these plaintiffs acquired title and possession of the Camby Road property, neither had been

2   done.  To date, plaintiffs, because they have already been overextended financially to pay for much higher

3   monthly mortgage payments and unanticipated additional payments for homeowners insurance and

4   property taxes. they have been unable to themselves pay for these needed home services or repairs.

5       224.   Lastly, since August of 2005, plaintiffs Rios and Muñoz have depleted personal savings and

6   incurred significant debt in order to pay for additional, unanticipated home-related expenses as described

7   herein above.

8       **ADDITIONAL FACTS RELATED TO DEFENDANTS' DISCRIMINATORY CONDUCT**

9       225.   In April of 2005, based on information and belief, the VDMF group that plaintiffs Jimenez,

10  Rios and Muñoz and defendant Diaz were all active members of, was comprised of a majority of members

11  who were of Hispanic national origin and Spanish speaking.

12      226.   Additionally, investigation conducted on the defendant affiliated brokers, realtors and their

13  authorized employees and/or agents named in this complaint, specifically, defendants Francisco

14  Cervantes, Teresa Diaz, Bobby Ray Lee, First Federal Mortgage Bankers and Citywide Home Loans

15  shows that:

16      227.   Since in or around April of 2005, based on information and belief, defendants FFMB,

17  Cervantes et al. have specifically outreached to Spanish language speaking consumers of Hispanic

18  national origin in the San Francisco Bay Area including to those seeking housing in Antioch, California

19  and in other parts of Contra Costa County and other surrounding San Francisco Bay Area counties. Said

20  defendants have engaged in such unfair and predatory solicitation, marketing, lending and other related

21  business practices through active pursuit of individualized solicitation efforts and channels, and by

22  distributing various marketing, advertising, promotional and other written or oral promotional materials in

23  the Spanish language to the public, and, also, through use of Spanish media to induce Spanish speaking

24  consumers, a majority of whom are of Hispanic national origin, to seek out, use and then trust these

25  defendants as fellow Spanish speakers to use their mortgage brokering and related services to enter into

26  costly and unaffordable loan transactions.

27      228.   Said defendants engaged in activities that were not only fraudulent, deceptive and unfair as

28  marketing, advertising and business practices, but through their focus on outreaching to and then

providing such predatory lending services and products to primarily Spanish speaking consumers of Hispanic national origin, constituted unfair and abusive lending practices against persons, including plaintiffs, who are members of this particular protected group under both federal and state fair housing and federal equal credit opportunity laws.

229.   Based on information and belief, these defendants' use of various forms of discriminatory and unfair advertising, marketing and solicitation activities included advertising on their websites in Spanish, conducting regular consumer information radio shows on a local Bay Area Spanish language station, and doing personalized outreach through use of "bird dogs" employees such as defendant Teresa Diaz to largely Spanish speaking and Hispanic groups such as the VDMF fellowship group which plaintiffs Jimenez, Rios and Muñoz were all active members in.

230.   The activities of these defendants, as alleged herein, demonstrate both the unfair and predatory nature of their lending, brokering and related realty activities as largely directed toward consumers of Hispanic descent seeking to purchase or refinance homes in  Contra Costa County and in other surrounding San Francisco Bay Area counties.

231.   These solicitation, advertising, marketing and other related abusive lending practices have deceived and injured plaintiffs and are likely to deceive and injure the consuming public, particularly, those of Hispanic national origin.

### VI.  CLAIMS
### A.  FIRST CLAIM
### [Fair Housing Act, 42 U.S.C. § 3601 et seq.]
### (All plaintiffs against defendants FFMB, Lee, Cervantes and Diaz)

232.   Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs above, as if set forth fully herein.

233.   The first and second loan note agreements originally entered into between defendants New Century and/or Wells Fargo and plaintiffs Murillos, Rios and Muñoz are all residential real estate-related transactions within the meaning of section 805 of the Fair Housing Act, 42 U.S.C. § 3605(a) ("FHA").

234.   The two Antioch subject properties which were secured by deeds of trust for the purchase loans which are the subject of  plaintiffs' claims are all real properties that constitute "covered" dwellings within the meaning of section 805 of the FHA, 42 U.S.C. §§  3602 and 3604.

235.   Plaintiffs are covered persons within the meaning of section 805 of the FHA, 42 U.S.C. § 3602. With regard to the discriminatory housing practices alleged, they constitute aggrieved individuals with regard to discrimination within the meaning of the FHA, 42 U.S.C. § 3602.

236.   Defendants FFMB, et al. and Cervantes and Diaz's business practices includes engaging in residential real estate transactions within the meaning of section 805 of the FHA, 42 U.S.C. § 3605(a), as well as 24 C.F.R. § 100.115(a).

237.   Defendants FFMB, et al. and Cervantes and Diaz's business practices includes engaging in residential real estate transactions within the meaning of section 805 of the FHA, 42 U.S.C. § 3605(a), these defendants are all brokers or agents within the meaning of 24 C.F.R. §§ 100.115(b) and 100.20, and these defendants' business includes engaging in the selling, brokering or appraising of residential real property within the meaning of 24 C.F.R. § 100.135(a).

238.   Defendants FFMB, et al. and Cervantes and Diaz's business practices includes engaging in residential real estate transactions within the meaning of section 805 of the FHA, 42 U.S.C. § 3605(a), and these defendants' business includes engaging in the selling, brokering or appraising of residential real property within the meaning of 24 C.F.R. § 100.135(a).

239.   As set forth above, defendants FFMB, et al. and Cervantes and Diaz's through their own conduct or that of authorized representatives and agents, have violated 42 U.S.C. §§ 3604 and 3605 by issuing predatory dual-purchase mortgage loans designed to fail with high interest rates, closing costs and fees to Hispanic borrowers (many of whom speak and read little or no English), including plaintiffs, because of their race, color, and national origin.

240.   Based on the factual allegations stated hereinabove, plaintiffs are informed and believe and on that basis allege that persons not of plaintiffs' national origin, color or race, who were no better qualified financially for a mortgage loan than plaintiffs, were either: a) offered loans on more favorable terms than those offered by defendants to plaintiffs; or b) were not issued predatory loans with high interest rates, closing costs, and fees as well as undisclosed terms which, given the terms of these loans and the borrowers' limited ability to repay them, were designed to ultimately fail, either by putting plaintiffs in an appreciably worse financial situation than they were in prior to receiving the home loans they did from defendants, FFMB, Cervantes, et a.

241.   Plaintiffs Murillos and Jimenez, after having paid since August of 2005, over $50,000 in mortgage payments and close to $15,000 each for property tax and homeowners insurance payments, on two essentially "interest only" home loans, still presently owe principal loan sums which are currently essentially equal to their original loan balances from August of 2005.

242.   During an initial two-year period, these plaintiffs have also been unable to seek refinancing into a less expensive lower rate loan without having to pay costly $12,000 payment penalty on this loan.

243.   Similarly, plaintiffs Rios and Muñoz, a direct and proximate result of being put into two purchase loans that they did not want nor could afford, have struggled for the last nineteen months to pay for monthly mortgage payments, homeowners insurance and property taxes that have exceeded their initial expectations and income means by approximately $1,000 a month.

244.   These plaintiffs contend that defendants FFHM, Cervantes, et al. put them into predatory and unfair purchase loans which were beyond their means and designed to fail. As result, they have struggled in the last year to make their loan payments and have suffered impaired credit as a direct result.

245.   On information and belief, plaintiffs further allege that based on the targeted and exploitative marketing and advertising practices that defendants FFMB, et al. and Cervantes and Diaz have engaged in, as identified hereinabove, their mortgage brokering and related realty services have resulted in a disproportionate number of the type of predatory loans described in the preceding paragraph to Hispanic borrowers in Contra Costa County, and within other surrounding immediate Bay Area counties of California in 2005.

246.   As such, these defendant brokers and real estate agents have discriminated against the plaintiffs in this action and others similarly situated based on a common Hispanic national origin in the provision of services in connection with residential real-estate transactions, or in the terms or conditions of such transactions, because of race, color, and national origin of the borrower in violation of 42 U.S.C. §§ 3604 and 3605.

247.   By the actions described herein and as a proximate cause of said defendants' conduct, plaintiffs have been damaged, as set forth above.

**B.  SECOND CLAIM**
**[Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.]**
**(All plaintiffs against defendants FFMB, Lee, Cervantes and Diaz)**

248.   Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs above, as if set forth fully herein.

249.   Plaintiffs are natural persons and residents of the state of California and of the United States.

250.   Defendants FFMB, et al. is a financial institution within the meaning of section 1691 of the Consumer Credit Protection Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA")

251.   FFMB, et al. does business in the state of California and is subject to the jurisdiction of this Court.  At all times relevant herein, defendants FFMB, et al. and Cervantes and Diaz, in the ordinary course of business, regularly extended, offered to extend or arranged for extension of credit to its consumer customers for which a finance charge was imposed.

252.   Within two years prior to filing this action, plaintiffs the Murillos and Amalia Rios and Maria Muñoz all entered into one or more credit transactions with these defendants incident to in which these defendants, as a direct result of their brokering mortgage loans for these plaintiffs with the lenders who are also party to this lawsuit, did impose finance charges on said plaintiffs.

253.   The conduct of defendants FFMB, Cervantes, et al., as alleged herein, constitutes a violation of ECOA.  Said defendants discriminated against plaintiffs based on race, color, and national origin in their credit and finance practices, determination of borrower creditworthiness, provision of services in connection with the offering of credit and making loan transactions, and in the terms or conditions of such transactions.

254.   Pursuant to the ECOA, plaintiffs are entitled to seek actual and punitive damages, among other remedies against these defendants.

255.   By the actions described herein and as a proximate cause of these defendants' conduct, plaintiffs have been damaged, as set forth herein.

### C.   THIRD CLAIM
**[Real Estate and Settlement Procedures Act, 12 § 2605, Reg. X, 24 C.F.R. § 3500.21]**
**(plaintiffs Murillos against defendants New Century, Wells Fargo, Chase and Ocwen]**

256.   Plaintiffs Juan and Maria Murillo reallege and incorporate by reference the allegations contained in all paragraphs above, as if set forth fully herein.

257.   The loan agreements between defendant lenders New Century, Chase and Wells Fargo and these plaintiffs are federally related mortgage loans as defined in the Real Estate Settlement Procedures

1   Act, 12 U.S.C. § 2602 ("RESPA").

2       258.   In or about September 7 and 22, 2005, plaintiffs Murillos sent qualified written request

3   letters to defendants New Century, Wells Fargo and Chase seeking clarification as to the terms and

4   conditions of their respective loan or loans and also an escrow accounting on said loan(s) being serviced

5   by these defendants.  Additionally, plaintiffs Murillos sought specifically to be provided copies of lender

6   underwriting and final settlements statement documents and records of all escrow payments made.

7       259.   To date, defendants New Century Wells Fargo and Chase have not provided to the Murillos

8   a statutorily proper response to these qualified written requests.

9       260.   Based on the foregoing facts as plead in herein and specifically in paragraphs 249 and 250

10  above, these defendants violated the Murillos' rights under RESPA by:

11          a.   by failing to properly and timely respond to qualified written requests presented to them by

12              the Murillos, in violation of 12 U.S.C § 2605, Reg. X, 24 C.F.R. § 3500.21.

13      261.   These defendants failed to meet their obligations under the RESPA.

14      262.   Pursuant to 12 U.S.C. § 2605, the Murillos are entitled to recover, and hereby seeks to

15  collect, from these defendants statutory penalties, as well as attorneys fees and costs, plus, actual damages,

16  court costs, and any other amounts or damages allowed by RESPA.

17      263.   By the actions described herein and as a proximate cause of defendants' conduct, plaintiffs

18  Murillo has been damaged, as set forth above.

19                          **D.  FOURTH CLAIM**
        **[California Fair Employment and Housing Act, Cal. Gov't Code § 12955, et seq.]**
20          **(All plaintiffs against defendants FFMB, Lee, Cervantes and Diaz)**

21      264.   Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs

22  above, as if set forth fully herein.

23      265.   Defendants have injured plaintiffs in violation of the California Fair Employment and

24  Housing Act by committing the above described discriminatory housing practices.  By the actions

25  described above, defendants have made housing unavailable and have discriminated in the provision of

26  services in connection with residential real-estate transactions, or in the terms or conditions of such a

27  transaction, because of race, color, and national origin in violation of California Government Code section

28  12955, et seq.

266.  By the actions described herein and as a proximate cause of defendants' conduct, plaintiffs have been damaged, as set forth above.

## E.  FIFTH CLAIM

**[California Unruh Civil Rights Act, Cal. Gov't Code § 51 et seq.]**
**(All plaintiffs against defendants FFMB, Lee, Cervantes and Diaz)**

267.  Plaintiffs reallege and incorporate by reference the allegations contained in all paragraphs above, as if set forth fully herein.

268.  Defendants injured plaintiffs by violating their right to fair housing under the Unruh Civil Rights Act, California Civil Code section 51, et seq.  The conduct of defendants alleged herein constitutes a denial of full and equal access to housing accommodations to plaintiffs within the meaning of California Civil Code section 51.

269.  Pursuant to the Unruh Civil Rights Act, plaintiffs are entitled to statutory damages, among other remedies, of up to three times their actual damages as determined by the trier of fact.

270.  By the actions described herein and as a proximate cause of all the defendants' conduct, plaintiffs have been damaged, as set forth above.

## F.  SIXTH CLAIM

**[California Civil Code § 1632]**
**(All plaintiffs against defendants FFMB, Lee, Cervantes, New Century, Wells Fargo, Chase and Ocwen)**

271.  Plaintiffs reallege and incorporate by reference the allegations contained in all the paragraphs above, as if set forth fully herein.

272.  Defendants failed to provide any loan documentation in the Spanish language despite the fact that the loans were negotiated in Spanish.

273.  Pursuant to subdivision (k) of California Civil Code § 1632, defendants must allow plaintiffs to rescind such loans.

274.  Pursuant to California Civil Code § 1691(b), this complaint serves as notice of rescission.

275.  Plaintiffs are entitled to rescind the loans and is entitled to equitable restitution.

276.  By the actions described herein and as a proximate cause of all the defendants' conduct, plaintiffs have been damaged, as set forth above.

### F. SEVENTH CLAIM
### [Breach of Fiduciary Duty]
### (All plaintiffs against FFMB, Lee, Cervantes and Diaz)

277. Plaintiffs reallege and incorporate by reference the allegations contained in all the paragraphs above, as if set forth fully herein.

278. By virtue of their relationship to plaintiffs as plaintiffs' real estate broker and real estate agent, defendants Diaz, Cervantes, Lee, First Federal and each of them, owed plaintiffs a fiduciary duty to provide them with competent counsel regarding the purchase of the subject property and to exercise the highest good faith toward plaintiffs.

279. Defendants made the representations and nondisclosure alleged in paragraphs 1- 229 above within the scope of their duties to said plaintiffs as fiduciaries.

280. Defendants Cervantes, Diaz, Lee, First Federal, and each of them conducted the transaction as fiduciaries of the plaintiffs.

281. Defendants Cervantes, Diaz, Lee, First Federal, and each of them breached their duty as fiduciaries to plaintiffs in that, through misrepresentation and nondisclosure, defendants failed to adequately guard and protect said plaintiffs' beneficial interest in the transaction.

282. As a direct and proximate result of these defendants' breach of their fiduciary duty, plaintiffs have been damaged as is to heretofore alleged.

### H. EIGHTH CLAIM
### [Fraud and Misrepresentation]
### (All plaintiffs against FFMB, Lee, Cervantes, Diaz, ELG and Blanco)

283. Plaintiffs reallege and incorporate by reference the allegations contained in all the paragraphs above, as if set forth fully herein.

284. Defendants Cervantes, Diaz, Lee, First Federal, and each of them, as alleged hereinabove, falsely represented to plaintiffs directly or through their agents, colleagues and or co-conspirators, that said plaintiffs would be put into more affordable and less costly purchase loans than the ones they were instead put into by these defendants.

285. These Defendants, and each of them, used fraud and deceit to prevent plaintiff from finding out that he was not qualified financially to purchase the subject property and could not, in fact, afford to purchase the subject property.

286.   Defendants, and each of them, used fraud and deceit in the preparation and submission of a loan application on behalf of plaintiffs for the purchase of the subject property.

287.   Defendants falsified information on plaintiffs' loan application and related documents, including plaintiffs' income information, which defendants fraudulently inflated to make it appear that these plaintiffs could afford to purchase the subject property.  Defendants did not tell plaintiffs that they were falsifying any information on his loan application or any other related document.

288.   Additionally, defendants used fraud and deceit to prevent plaintiffs from learning that they were falsifying income and other information on their loan applications and related documents and to trick these plaintiffs into signing loan papers which lead to their being put into "interest only" or high interest rate subprime loans with costly prepayment penalties and higher monthly payments than what these Plaintiffs wanted or could afford.

289.   At the request of these defendants, plaintiffs provided accurate documentation of their actual income to defendants Cervantes, Diaz, FFHM before completion of their loan transactions.  Despite this, these plaintiffs allege based on information belief that said defendants falsified and inflated significantly their income information on loan application and other documents for the subject property.

290.   Furthermore, defendants unknown to the plaintiffs at the time, put plaintiffs Murillos and Rios / Muñoz into "income stated" purchase loans.  All key disclosure and loan documents were in English even though all verbal communications between plaintiffs and authorized defendants occurred in Spanish.

291.   Plaintiffs also represented to said defendants prior their signing of any final loan papers  that they could only afford certain monthly mortgage payment amounts, including for homeowners insurance and property taxes.  Plaintiffs did not know that these defendants would instead put them into more costly and expensive home loans.

292.   Defendants' representations as set forth in this cause of action were made with the knowledge that they were false and with the intent deceive the plaintiffs and that plaintiffs would rely thereon.  The plaintiffs was reasonable and justified in relying on said representations and nondisclosures because the plaintiffs were unsophisticated regarding real estate transactions and severely limited in English, whereas defendants were experienced in real estate dealings and plaintiffs had a right to rely on

1    their honesty and expertise.

2         293.   As a direct and proximate result of said representations plaintiffs relied on said

3    representations and have been damaged as heretofore alleged.

4         294.   Plaintiffs reallege and incorporate by reference the allegations contained in all the

5    paragraphs above, as if set forth fully herein.

6         295.   Additionally, by virtue of their relationship to plaintiffs as plaintiffs' real estate broker and

7    real estate agent, defendants Diaz, Cervantes, Lee, First Federal, and each of them, owed plaintiffs a

8    fiduciary duty to provide them with honest and competent counsel regarding the financing of the subject

9    Antioch properties and to exercise the highest good faith toward plaintiffs.

10        296.   Defendants made the false representations and nondisclosures alleged above within the

11   scope of their duties to plaintiff as fiduciaries.

12        297.   The representations and nondisclosures referred to above were material to the plaintiffs'

13   decision to go forward with their loan transactions.

14        298.   As a direct and proximate result of said representations and nondisclosures, plaintiffs have

15   been damaged as is heretofore alleged.

16                              **I.  NINTH CLAIM**
                                 **[Negligence]**
17                       **(All plaintiffs against all defendants)**

18        299.   Plaintiffs reallege and incorporate by reference the allegations contained in all the

19   paragraphs above, as if set forth fully herein.

20        300.   Defendants Cervantes, Diaz, Lee, FFMB, ELG, New Century, Wells Fargo and Chase had a

21   duty to act reasonably and prudently as real estate agents, mortgage brokers, mortgage lenders, and

22   financial lenders in their cumulative communications and dealings with plaintiffs.

23        301.   A reasonably prudent real estate agent, mortgage broker, and mortgage lender and financial

24   institution would not have steered the plaintiffs to take out the subject mortgage loans of this action,

25   originated and purchased these loans, nor provided related mortgage services for the promissory notes that

26   are related to these loans.

27        302.   Additionally, these defendants acted negligently in failing to properly consider, investigate

28   and evaluate the true nature of the annual incomes of these plaintiffs for "income-stated loans" in

accordance with professional, industry-wide best practices standards.

303.   These defendants further failed to consider all of the underwriting factors customarily utilized to determine the credit-worthiness of a borrower when they issued plaintiffs Murillos and Rios / Muñoz their loans.

304.   These defendants knew or should have known to apply these best practices in underwriting, originating, and issuing to plaintiff Murillos and Rios / Muñoz their mortgage loans.

305.   These defendants, at all stages, failed to apply such sound professional underwriting standards and to meet best practices standards that govern the issuance of mortgage loans to consumers, and subsequent servicing, purchase, and sale of these loan notes on the secondary loan market.

306.   By the actions described herein and as a proximate cause of the defendants' negligent conduct, plaintiffs Murillos, Jimenez, Rios and Muñoz suffered humiliation, mental anguish, severe emotional distress—including the attendant physical injuries and conditions—and other special and general damages according to proof.

## J.  ELEVENTH CLAIM
### [Unfair Advertising, B&P § 17500, *et seq.*]
### (All plaintiffs against defendants Cervantes, Lee and FFBM)

307.   Plaintiffs reallege and incorporate by reference the allegations contained in all the paragraphs above, as if set forth fully herein.

308.   The advertising, promotional materials and other written or oral promotional efforts undertaken by defendants to induce consumers to enter into loan transactions contained statements that were deceptive, untrue and/or misleading, or omitted material information, and which were known, or b the exercise of reasonable care should have been known, by defendants to be deceptive, untrue and/or misleading, in violation of California Business and Professions Code §17500, *et seq.*

309.   Defendants' use of various forms of advertising call attention to or give publicity to the sale of their goods and services, and other practices, as set forth above, which were not as advertised or as otherwise represented, constituted unfair competition, deceptive, untrue and/or misleading advertising and unlawful business practice within the meaning of California Business and Professions Code **§§** 17200, *et seq.* and 17500, *et seq.*

310.   These advertisements and practices have deceived and injured plaintiffs and are likely to

deceive and injure the consuming public in violation of those sections.

311.   Pursuant to California Business and Professions Code **§§** 17203 and 17535, plaintiffs individually and on behalf of the public, seek an order of this Court enjoining defendants from continuing to engage in their false advertising practices.  The public and plaintiffs will be irreparably harmed if such an order is not granted.

312.   Defendants have been unjustly enriched at the expense of the plaintiffs, who therefore are entitled to equitable restitution and disgorgement of profits realized by defendants as a result of their unfair, unlawful, deceptive, untrue and/or misleading advertising practices.

313.   Moreover, because plaintiffs bring this action on behalf of themselves and on behalf of the general public, they are entitled to reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

314.   As a direct and proximate result of said representations and nondisclosures, plaintiffs have been damaged as is heretofore alleged and seek relief as set forth below.

### K.  TENTH CLAIM
### [Unfair Competition, B&P § 17200, *et seq.*]
### (All plaintiffs against all defendants)

315.   Plaintiffs reallege and incorporate by reference the allegations contained in all the paragraphs above, as if set forth fully herein.

316.   Defendants and each of them, engaged and continue to engage in unlawful, unfair and fraudulent business practices as described above in violation of the Business and Professions Code 17200 et seq, which provides for injunctive relief.

317.   The violations effected numerous persons and it is impractical to bring them all before the court.

318.   The violations directly and proximately caused plaintiff to suffer injury, lose money and lose property.

### VII.  RELIEF.

Wherefore, plaintiffs pray for the following relief:

1.      That the Court assume supplemental jurisdiction over all state law claims, pursuant to 28 U.S.C. § 1367;

**Murillo, et al. v. Cervantes, et al.** – **(Case no. C07-02199 MEJ)  Second Amended Complaint**

- 43 -

2.   That the Court declare that defendants violated applicable provisions of federal and state law;

3.   That the Court enjoin all unlawful practices complained of in this action and impose affirmative injunctive relief requiring defendants, their partners, agents, employees, assignees, and all persons acting in concert or participating with them, to take affirmative action to immediately implement policies designed to ensure: (1) that all prospective borrowers' loan applications not contain false information; (2) a thorough evaluation of all prospective borrowers' ability to repay any loans made available to them; and (3) training regarding applicable lending laws for all of defendants' employees and agents;

4.   That the Court further enjoin defendants Chase, Wells Fargo, Ocwen and any of their authorized agents, representatives and employees, plus, any and all subsequent assignees of said defendants from transferring, selling or in any manner encumbering those loans which are the secured by deeds of trust against one or more real properties which are the subject of this action in any manner which will cause financial detriment or harm to the plaintiffs or, otherwise, result in said plaintiffs' unauthorized loss or unwanted transfer of legal ownership of said properties to any third or other parties;

5.   That the Court award compensatory and punitive damages to plaintiffs according to proof;

6.   That the Court award plaintiffs costs of suit, including reasonable attorneys' fees;

7.   That the Court order plaintiffs' loans reformed or rescinded as provided for specifically under California Civil Code Section 1632 and any other relevant claims herein; and

8.   That the Court award plaintiffs all other relief as the Court deems just and proper.


**DATED:** August 27, 2007          **LAW OFFICES OF MATTHEW J. WEBB**
                                     Attorney for Plaintiffs


                                     **By:_____/ S /_____**
                                        **Heidi Li, Esq.**

## VIII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury as to each and every claim for which they are so entitled.


**DATED:** August 27, 2007                    **LAW OFFICES OF MATTHEW J. WEBB**
                                              Attorneys for Plaintiffs


                                    **By:**_____/ S /_____
                                              **Heidi Li, Esq.**